**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK ANTHONY PERRY, SR.** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:18-1430** |
| **v.** | : | **(JUDGE MANNION)** |
| **MIKE WELKER,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

**I. BACKGROUND**

Plaintiff, Mark Anthony Perry, Sr., an inmate formerly confined at the Dauphin County Prison, Harrisburg, Pennsylvania, filed the above caption civil rights action pursuant to 42 U.S.C. §1983.[1] (Doc. 1). The named Defendants are the following Dauphin County Prison employees: Jill Cuffalo, Treatment Counselor; Russell Hewitt, Lieutenant of Security; and Mike Welker, Classification Supervisor. Id. Plaintiff states that he was "put in protective custody" on June 30, 2018, due to "serious safety issues" at Dauphin County Prison. Id. He lists each Defendant individually, and the claims against each, as follows:

---

[1] Plaintiff is currently housed in the ADAPPT, residential reentry center, 428 Walnut Street, Reading, Pennsylvania.

Cuffalo

Plaintiff states that Defendant Jill Cuffalo "put [his] life in danger on May 14, 2018". Specifically, he claims that on May 13, 2018, he put in a separation request from inmate, Mason Williams, after Williams "found out Plaintiff gave information on him back in late January concerning vast amounts of drugs being brought in daily." Id. Plaintiff claims that Cuffalo "also knew about [his] dealings with security", as he "wrote her a letter on March 8, 2018 explaining everything [he] did, it is on record". Id. Plaintiff states that "knowing all of this she decided to make comments on May 14, 2018 to inmate Ruffis Foster when he mentioned [Plaintiff's] request at his disciplinary hearing." Id. Mr. Foster, "was in fact [Plaintiff's] cellmate the day of May 14th" and "Foster made an inquiry about [Plaintiff's] separation request", to which Cuffalo "stated to Foster 'stop trying to cop pleas for your celly, I am letting him get moved anyway." Id.

On May 16, 2018, Plaintiff states that he was "in fact moved from P-6 block to P-1, where Williams was housed." Id. On May 17, 2018, Plaintiff put a grievance in "on treatment for blatantly disregarding my well-being and safety." Id. Plaintiff was "immediately moved back May 17, 2018 to cell P-6-13, 30 minutes after grievance was retrieved by Cuffalo." Id.

- 2 -

Hewitt

Plaintiff states that "during a court line proceeding for Nathyn Edelman on April 9, 2018, Lt. Russell Hewitt disclosed to Mr. Edelman that [Plaintiff] was the one who gave information on him that led to his original move to lock in status on February 5, 2018." Id. Plaintiff claims that on May 28, 2018, Mr. Edelman "notified [Plaintiff] that he was told by Hewitt in the presence of no other than Jill Cuffalo that [Plaintiff] told on [Edelman]". Id. Plaintiff has "been in lock in status since March 6, 2018, because he has been labeled as a "jailhouse snitch." Id.

Welker

Plaintiff alleges that on March 14, 2018, Defendant, Mike Welker, "knowingly and deliberately moved [Plaintiff] to cell P-1-10 with Shaquon Thompson", who Plaintiff claims had recently been "found guilty by Jill Cuffalo and Lt. Hewitt for sexual harassment and sexual assault on his former cellmate." Id.

On April 11, 2018, Plaintiff states that "Mr. Thompson sexually assaulted [Plaintiff] and attacked [him] from behind" and "grabbed his genitals and when [Plaintiff] went to the cell door he came up from behind and punched [Plaintiff] numerous times in the head and face." Id. Plaintiff claims that when he informed Defendants Cuffalo and Hewitt that Thompson

sexually assaulted him, they "laughed and said we didn't have any idea he was gay." Id. Plaintiff was moved to another cell on April 11, 2018 and Thompson was moved to a single cell.

Plaintiff further alleges that on June 20, 2018, his June 11, 2018 request for a single cell was denied by Defendant Welker, even though a single cell was available. Plaintiff believes this to be "characteristics of malicious intent, to say the very least." Id. Plaintiff alleges that after his request for a single cell was denied, an inmate, Omar Stoddard, that Plaintiff classifies as a "mentally deranged man" was moved into his cell. Id.

Thus, Plaintiff filed the instant action in which he seeks compensatory and punitive damages for "the negligence, endangerment, mental anguish, pain and suffering that administration, security, treatment and classification of Dauphin County Prison subjected [him] to for malicious reasons." Id.

On September 12, 2018, Defendants filed a motion to dismiss. (Doc. 17). On September 26, 2018, Defendants filed a brief in support of their motion to dismiss. (Doc. 19).

On February 20, 2019, in accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), (holding that the District Court shall provide the parties notice that it will consider exhaustion in its role as fact finder under Small v. Camden Cty., 728 F.3d 265 (3d Cir. 2013)), this Court issued an

Order, converting Defendants' motion to dismiss to a motion for summary judgment and allowing the parties an opportunity to supplement the record with supporting evidence relevant to the exhaustion of administrative remedies. (Doc. 23).

On March 25, 2019, Defendants filed a motion for summary judgment on the issue of administrative exhaustion, along with a statement of material facts and brief in support. (Docs. 27, 28). On April 3, 2019, Plaintiff filed a brief in opposition to Defendants' motion for summary judgment, (Doc. 29) and on April 17, 2019, Defendants filed a reply brief. (Doc. 30).

Defendants' motion is ripe for disposition. For the reasons set forth below, the Court will grant Defendants' motion for summary judgment.

## II. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to

- 6 -

demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III. STATEMENT OF MATERIAL FACTS[2]

---

[2] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party]...as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. Id. Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein is taken from Defendants' Rule 56.1 statement of material facts. (Doc. 27). Plaintiff did not file a response to Defendants' statement of facts in compliance with M.D. Pa. L.R. 56.1. Thus, the Court deems the facts set forth by Defendants to be undisputed. See M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2).

The Dauphin County Prison has an inmate grievance procedure. (See Doc. 27-7 at 1). The process first requires the inmate to "write out the complete grievance being as brief but as specific as possible soon after the alleged occurrence." Id. The grievance must be submitted to the Warden, Deputy Warden, or a Security Major. Id. If the grievance is denied, the inmate can appeal to the Chairman of the Dauphin County Prison Board of Inspectors. Id. A further appeal is then to be taken to the full Prison Board. Id. Finally, an appeal from the full Prison Board can be taken to the Dauphin County Solicitor. Id.

The undisputed facts set forth by the Defendants reveal the following with regard to Plaintiff's failure to exhaust administrative remedies:

### a. First Request for Single Cell

On or about March 12, 2018, Plaintiff submitted a request slip to Defendant Cuffalo stating:

> I am putting this request in for hope that I can get the single cell on P-1 or P-6. To negate any issues security wise fore I am not the best candidate for being someone's celly. The reason I'm here is interesting to say the least and I need to process it [...]

(Doc. 27-9, Request Slip).

In response to Plaintiff's request, Defendant Cuffalo wrote, "Moved to P1. No single cell available." Id. Plaintiff did not file a grievance in relation to the denial of this request. (See Doc. 27-8, Treatment Program Notes).

### b. **Complaints concerning DCP officer's alleged statements**

Plaintiff alleges that on March 30, 2018, he complained to Defendants about officers spreading information about him around the prison. (See Doc. 1 at 4-5). The record reveals that, while Plaintiff submitted three Inmate Request Forms (See Docs. 27-10, 27-11, 27-12) and a letter (Doc. 27-13) about rumors being spread, he never filed a grievance beyond his initial request slips, or the responses thereto. (See Doc. 27-8, Treatment Program Notes).

### c. **Being celled with Inmate Thompson**

Plaintiff submitted the following undated letter, he calls a "grievance", to Defendant Cuffalo:

> I am putting this grievance in on the treatment department head. On 3-13-18 I was moved from segregation P-3-5 to regular lock in P-1 -10. I was celled up with Mr. Shaquon Thompson. This should never be allowed. It has been brought to my awareness that Mr. Thompson was found guilty of sexual harassment/ assault on his former celly. Mr. Thompson propositioned and ultimately tried to use force on his celly Eric Foster. There is witnesses who heard the altercation as well as Mr. Thompson

repeatedly making lewd and inappropriate nature to several PC inmates. Mr. Thompson wanted oral & anal sex from Foster. I was, on several occasions, attempted to be baited via comments by Mr. Thompson. He would talk about erections & wet dreams, etc., which led up to our altercation on 4-11-18. The emergency call button was pressed when C.O. Johnson appeared at my door I went to tell what was going on and Mr. Thompson attacked me from behind. When I subdued him he also grabbed a hold of my genitalia. I feel as though I was purposely put in that cell with Thompson because of my original reason for being in Locks and my ultimate exposing of Lt. Polygon and his insubordination and letting it beknown to 3 other white shirts and a sgt. that my intentions where[sic] to retrieve contraband (drugs) for Polygon's investigation which he had no authorization to give. I found out after. I was working with officials for over 2 months and even went so high as to meet with the Warden. After my removal from P-1 ironically Thompson was then moved to a single cell, somewhere where he should have been in the first place. He is in here for stabbing someone 4 times by his heart, he has been in 3 altercations in here and is a known Homosexual predator inside these walls and I was put in a cell with him. I have been wrongfully accused and mistreated since 3-6-18 and this is definitely a case of unnecessary duress and endangerment. I was purposefully put in a cell with a sociopath with severe mental health issues and predatory natures of the sexual kind and this is no secret to the prison. Needless to say I am perturbed and I need resolution to this issue. I am subject to all this abuse for telling the 100% truth and doing what I thought was right according to officials.

(Doc. 27-13, letter).

On August 7, 2018, the Warden denied Plaintiff's grievance as follows:

This memorandum is in response to an undated grievance that was submitted by Inmate Mark Perry and was found in his Treatment file. It is believed to have been submitted on May 5, 2018. [...] On March 6, 2018, Perry was moved to P-3-05 for a disciplinary report he received. On March 13, 2018, Perry was transferred from P-3-05 to P-1-10 with Thompson. On April 11,

- 11 -

2018, they were involved in an altercation and both received disciplinary reports against them. Perry went to the in-house disciplinary board ("Courtline") on April 16, 2018, and pled guilty to the charge of fighting and received 60 days to serve in the disciplinary unit. Perry was not placed into a cell with Thompson due to any retaliatory measures; he was simply moved to an open housing location. Perry was in that cell for 28 days without any request slips indicating a problem him and his cellmate. In fact, on March 29, 2018, Perry signed a "Request for Protective Custody" sheet indicating that he did not need Protective Custody (PC). After researching Perry's grievance, Perry and his cellmate lived together with no issues until an altercation occurred for a reason only known to them. He even signed a form that he did not need PC from his cellmate of his housing block during that time. Therefore, I find his complaint has no merit.

(Doc. 27-14). Plaintiff received the Warden's response on August 24, 2018,

and filed the following "appeal" the same day:

Mr./Ms. Chairperson this is an appeal to the no merit response by Mike Welker concerning putting me at serious risk being celled with Shaquon Thompson. First off how is it possible that a grievance put in 2 weeks before a second one is answered 23 days after second as well as it being 4 months less a week!? Blatant interference! [illegible] Mr. Welker definitely is biased in his opinion. He [illegible] the names of defendants on my civil case. He says that my grievance is believed to have been submitted on May 5, 2018. Believed? This must mean there is no documentation for whatever reason. Another mystery. What I do know is I [illegible] in claim for civil action that I submitted a grievance on May 4, 2018. In this claim I [illegible] all info I did in original grievance. Coincidence? I think not. All documents I submit one followed with request asking for [illegible] of submitting [illegible] attached request to guidance dating EXACT DATE. Not believed to be [illegible]. Continuing forward, Mr. Thompson admitted to grabbing my genitals. C.O. [illegible] confirmed this to me & my celly several weeks ago. I also was in the same room with him for 30 minutes on 8-1-18. He admitted to it in front of C.O. Melcher, the barber, me and DeAngelo

- 12 -

[illegible]. This took place in P-block multi room in afternoon during P.C. haircuts. You will see me [illegible] amount for my [illegible] been in the room with him? We have a separation [illegible] Answer, no. After making allegations I still was put at risk. The incident on April 11, 2018. My failure to [illegible] problems [illegible] The fact is I should of never [illegible] placed in the cell. Eighth Amendment [illegible] protect from substantial risk existed because [illegible] deliberately indifferent to this risk and failure to take reasonable safety measures. Risk of [illegible] existed for I was double celled with an [illegible] predatory behavior and was [illegible] write ups in which he was found guilty for [illegible] disgusting behavior, and [illegible] So the prison knew who [illegible] celled with. After altercations [illegible] raped [illegible] single cell P-1-2. Coincidence? No. I did not found out about his violent & sexually predatory behavior until I was moved to P-6 and talked with Eric Foster and other P.C. inmates so I had no reason to suspect Thompson for the previous 27 days of being housing with him! I found out for myself on the 28th day. I also informed several officers about sexual assault. I also informed Cuffalo and Hewitt at my Courtline hearing that he was gay & he grabbed by genitals. They found it humorous and stated they had no knowledge of him being Homosexual. They were the ones who found him guilty for sexual harassment and assault. Thinking he solicited Eric Foster for oral & anal sex and then became [illegible]. Also my 8th Amendment [illegible] due to administration putting [illegible] dangerous housing knowing I was an inmate informant. My denial from P.C. was [illegible] of pride and had nothing to do with Thompson which Welker [illegible] because he was there. It was because of Security telling [illegible] an informant and had it is not [illegible] in this prison but other & [illegible] as well. I have proof of that and was truly afraid once I obtained it. [illegible] May 29, [illegible] the officer [illegible] mistreatment and abuse [illegible] me or I would of definitely exposed the office. Now that I [illegible] of protection [illegible]  fear to be forthcoming but am still weary about my safety! I also [illegible] guilty because [illegible] are [illegible] by [illegible] official to plead guilty and [illegible] or plead not guilty and [illegible] the maximum. 60 days at that time was better than 90. At review [illegible] written documentation [illegible] which brought [illegible] in the first place. It is on record. Right to Know

[illegible] back up my claim [illegible] informant [illegible] dangerous housing falls on the administration. I [illegible] and with 5 people. I gave info [illegible] Thompson called me a rat after I was moved and as I was leaving. Also on P-1 & P-6 where housed Mason Williams, Ja[illegible] Hoff[illegible], Adr[illegible] , Nathan Edelman, individuals I gave info about  [illegible] off of [illegible] and time I was housed with all 5 people [illegible] Thompson egregious risk? Without [illegible] !! [illegible] to have Oscar award with my performances to say the least. Administration left me out in the open to be slaughtered. Once I was threatened with serious bodily harm I had to take action [illegible] security [illegible] For the life of me [illegible] in the prison so [illegible] My life is [illegible] to officials except for Director Smeltzer [illegible] Also I have [illegible] to my first appeal submitted 8-2-18.

(Doc. 27-16, Appeal). On September 19, 2018, Commissioner Michael Pries

denied Plaintiff's appeal as follows:

> I have reviewed your complaint outlined in your correspondence to me dated 8/24/18. File Records were pulled and thoroughly reviewed.
>
> After reviewing the information in your appeal, on 3/6/18, you were moved to P3-05 due to a disciplinary report which was issued to you. On 3/13/18 due to an open housing location, you were reassigned via housing transfer from P3-05 to P1-10 (with Shaquan Thompson). You remained housed with Thompson for 28 days without incident or submitting any request slips indicating any issues with your cellmate (Thompson). If you felt threatened or as if any inmate would do you harm, the option remains you could request Protective Custody. Furthermore, on 3/29/18 (while still housed with Thompson), you signed a Request for Protective Custody sheet indicating that you did not need Protective Custody (PC).
>
> On 4/11/18, both you and Thompson were involved in an altercation resulting in disciplinary measures. At your Courtline

review, you plead guilty to the charge of fighting and subsequently received 60 days to serve in a disciplinary unit.

There is no basis for further action. You were not housed in a cell with Thompson due to any "retaliatory measures." The Warden's response stands as previously written. Therefore, your grievance appeal is denied.

If you do not agree with the above findings, you may appeal to the next level, that being the full Prison Board. This appeal, along with any additional information, should be directed to the Administrative Offices for forwarding to the Prison Board for review at its next scheduled monthly meeting.

(Doc. 27-14, Appeal Response). Plaintiff received this grievance appeal denial on October 4, 2018. (Doc. 27-18, receipt). No further appeal to the full Prison Board or Dauphin County Solicitor was filed. (See Doc. 27-8, Treatment Program Notes).

### d. Separation Request from Inmate Williams

Plaintiff filed two grievances regarding a separation between he and Inmate Williams. (Docs. 27-20, 27-21).

By response dated July 19, 2018, the Warden denied Plaintiff's grievances, finding the following:

This memorandum is in response to a grievance submitted by Mark Perry dated May 16, 2018, Perry wrote that he submitted a request for separation between him and Inmate Mason Williams on Monday (which would have been May 14, 2018) and does not want Protective Custody (PC). Perry wrote that his request was

- 15 -

disregarded because he was moved on May 16, 2018 to P-1 (the block where Williams was housed). Perry also wrote that he doesn't understand the Administration's disregard for his well-being, understands that this grievance will not be honored, and wants a copy of his request for separation.

Perry submitted two requests for separation from Williams; one dated May 13, 2018, and another dated May 21, 2018. I received and responded to the first one on May 18, 2018. On May 16, 2018, Perry was moved from P-6 to P-1 where Williams was housed. On the morning of May 17, 2018, the conflict and separation request was brought to my attention and I had Perry immediately moved back to P-6.

Perry was on P-6 from April 11, 2018, and I receive no request for separation from Williams. On his request of May 13, 2018, Perry gives no reason for this separation request. I responded to both requests and the responses were returned to him.

After researching Perry's grievance, it appears that Perry's request for separation from Williams was sent so close to his move that it was not able to be processed before his move to P-1 occurred. When I was informed of the request, Perry was immediately removed from the block where Williams was housed to protect his well-being. His grievance is being honored and a response to his request was given to him. Therefore, I find his complaint has no merit.

(Doc. 27-24, Grievance Response). Plaintiff received the Warden's response

om August 1, 2018. (Doc. 27-23, receipt).

On or around August 1, 2018, Plaintiff sent a request slip addressed to

"Administration" that stated, "enclosed is an appeal to grievance dated 7-25-

18 out of Wardens office, for prison board chairperson." (Doc. 27-25,

Appeal). The enclosed "grievance appeal" directed to the Prison Board

Chairperson stated:

> This is an appeal to my complaint that was deemed to have no merit on supposedly the date of 7-19-18. I put in a document to you about my ordeal and the negligence in my grievance process 6-25-18 so you should be familiar. It's ironic to say the least, my complaint is finally responded to Two days ago. My motion to file lawsuit was granted and notices were sent out to me & prison. Mr. Welker is one of the defendants on my suit so it's of no surprise my situation was downplayed. Welker among others [illegible] aware of my situation. It is [illegible] I gave information on Mason Williams since back in January. So when I asked to be separated to avoid conflict and physical altercation my separation should of immediately been handled. Welker [illegible] no reason but in the same breath states [illegible] was brought to his attention was immediately moved to protect my well-being If I have no reason what is the reason to protect? Makes no sense. [illegible] thing is all a covering of tracks that I see as [illegal] and the U.S. Middle District Court upon explanation of my situation has granted my motion stating blatant interference. My remedies were exhausted because of this interference. I wrote to you & the solicitor to rectify this. The only reason this grievance was humored was I did what I said I was gonna do and took legal action. My ignorance has allowed things to happen to me that the prison [illegible] not by allowing I [illegible] have rectified that and have done my due diligence to say the least.
>
> I have solid 8th amendment arguments that are self explainable as well. Once again, my grievance having no merit is false and my separation request was valid. I should not of been moved it clearly shows because once I took a stand I was returned to old block. Therefore request should have been handled. It was received 5-14-18 at 8 in the morning. I wasn't moved til 5-16-18 at 5 pm. If request was not disregarded on the 14th none of this would be necessary, at least concerning this matter. 30+ hrs is not enough time?

But as the 17th it only took 1 hr!! I would appreciate some accountability and fairness in this matter. Good day to you.

 [...]

Also Welker, if not informed before, was informed on 3-30-18 about my situation as well as security's involvement in the leaking of me being an informant. I also did not know Williams intention until 5-11-18 once I received a slip to use.

I stated that I know grievance wouldn't be changed. Welker is saying it is only after my motion was granted for lawsuit. If this was of [illegible] grievance would have been responded to in a timely manner. I know of several inmates who's [sic] were responses to several weeks before mine (30+days) and they put their grievance in a [illegible].

Id. On August 29, 2018, Commissioner Pries denied Plaintiff's appeal as

follows:

I have reviewed your complaint outlined in your correspondence to me dated 8/1/18. File Records were pulled and thoroughly reviewed.

After reviewing your appeal, it appears that Treatment Evaluator Mike Welker performed his job duties and rectified the situation as soon as he was notified of any issues. If you felt as if any inmate would harm you, you could request Protective Custody. At no point did Welker intentionally jeopardize your safety or well-being. On Monday May 14, you declined PC status. Subsequently,  you were moved to P-1 on May 16, 2018. When Treatment Evaluator Welker received notice, that there was an issue between you and another inmate on the unit, you were immediately moved off the block (P-1) back to P-6 where you were originally housed.

It appears that your request for separation and the move to P-1 occurred simultaneously. Once Welker received knowledge of the separation request, he acted appropriately, and within the

scope of his job duties to acknowledge your request and returned you to your previous housing unit.

There is no basis for further action. The Warden's response stands as previously written. Therefore, your grievance appeal is denied.

If you do not agree with the above findings, you may appeal to the next level, that being the full Prison Board. This appeal, along with any additional information, should be directed to the Administrative Offices for forwarding to the Prison Board for review at its next scheduled monthly meeting.

(Doc. 27-26, Appeal Response). Plaintiff received a copy of the grievance

appeal denial on September 5, 2018. (Doc. 27-27, receipt). No further appeal

to the full Prison Board or Dauphin County Solicitor was filed. (See Doc. 27-

8, Treatment Program Notes).


### e. **Plaintiff's second request for single cell**

On June 11, 2018, Plaintiff sent a request slip to Defendant Welker

stating the following:

Mike, when a cell that is single on my block (7,8) opens up can I move into it. I got 21 days left and I got a lot on my mind I just ask can I get my mind right and ready to go back into population as we all know I got issue with and in this jail.

(Doc. 27-28, Inmate Request Form). A June 20, 2018 response stated,

"denied @ this time." Id. No formal grievance was filed regarding the denial

of his request for a single sell. (See Doc. 27-8, Treatment Program Notes).

### f. **Plaintiff's Placement with Stoddard**

Plaintiff alleges that after his request for a single cell was denied, an inmate, Omar Stoddard, when Plaintiff classifies as a "mentally deranged man" was moved into his cell. (See Doc. 1 at 6).

Plaintiff did not file any grievances concerning being housed with inmate Stoddard. (See Doc. 27-8, Treatment Program Notes).

### g. **Plaintiff receiving threatening letters**

On June 28, 2018, Plaintiff sent a letter within the prison stating:

> I have no request slip so I am using this. I am stating for the record I received a threatening note a few weeks ago. I wasn't quite sure if I wanted to reveal this but after receiving counsel from my lawyer and family and considering what my attorney has in writing about an officer telling an inmate, someone who I actually implicated in the drug situation, I told on him leads me to tell I received a note saying when I get out the hole my head is gonna get split wide open. For working with the "black shirts". This is what I wanted to talk to Director Smeltzer about. This is ongoing issue all behind individuals trying to see me harmed for telling the truth! Like I said it is no longer hearsay my attorney has proof. Signed & witnessed. I get out of locks Monday or Tuesday.

(Doc. 27-29, letter).

On June 29, 2018, Defendant Cuffalo noted in the DCP Treatment Notes that:

> Received a letter from inmate stating that he has received threats of bodily harm when he gets out of lock in. I reported this to

Director Smeltzer and Smeltzer did speak to inmate. It was decided that inmate will be moving to PC tonight on the move list. The letter was placed in inmate's TX file.

(See Doc. 27-8, Treatment Program Notes). Plaintiff never filed any grievance in relation to this course of action. Id.

### h. **Plaintiff's grievance regarding response time to grievances**

On August 24, 2018, Plaintiff sent a request slip directed to "Director Smeltzer" enclosed with a document stating the following:

This grievance is on treatment for showing conflict of interest, negligence, and blatant interference concerning the process of my two grievances one Dated 5-4-18 the other 5-17-18. Dates of responses were 8-1-18, 8-2-18 and 8-24-18. My grievances were not answered in order to was given and responses were 75 days later and 114 days respectfully. We all know this is an absurd amount of time. I was told by several officials process takes 30 days. My appeal was responded to for my drug, contraband write up 2½ weeks after submitted and sent from office to me (determination ) 2 weeks later. Second, Mike Welker knows the name on my civil action. He answered this with a biased mindset, who wouldn't His responses were mere covering of tracks and has multiple holes which is proven! Thirdly, on my grievance for serious [illegible] being housed with Shaquon Thompson. Welker states grievance was "believed to be" submitted on 5-5-18. What exactly does this mean? Where is my original grievance & request slip that was dated? What I do know is on my civil claim I stated my grievance was submitted 5-4-18 a day after his "guess" and also all info concerning grievance was on claim. I need my original grievance & slip produced. From my perception my grievance was neglected & discarded. What else would the date be believed to be 5-5-18? And why was my first grievance answered and given to me 23 days after (13 days before-36 days total) my second grievance was answered? My perception once

again is my grievances were neglected and not going to be answered. There were once motion was filed and subsequently granted. They would still be collecting dust if civil suit wasn't granted. I'm sure there is proof the other grievance were responded to after May 4th and before August 24th, of other inmates. I know for a fact grievances & appeals are answered in an orderly & monthly fashion. Good day to you. I await a response with eagerness. A response from the head of treatment. I request respectfully.

(Doc. 27-30, Inmate Request Form).

On September 25, 2018, Defendant Welker found no merit to Plaintiff's

complaint, based on the following:

This memorandum is in response to a grievance submitted by Inmate Mark Perry dated August 24, 2018. [...]

After researching Perry's Treatment file, I found 2 grievance/grievances responses authored by me. The first grievance, which he claimed was submitted on May 4, 2018, but was undated and did not have a request slip attached when I received it to answer (copy attached), was found in his Treatment file and answered on August 7, 2018. I am unsure how it was placed in his Treatment, unanswered, but can only say that the Treatment department was undergoing changes at the time and was inadvertently filed. When it was discovered it was answered as soon as possible.

The second grievance which he claimed was filed on May 17, 2018, is dated May 16, 2018 (copy attached). That grievance was answered on July 16, 2018. This grievance was answered first because I received it before the other grievance.

To my knowledge there is no time frame to answer grievances except as soon as possible. Variables such as grievance routing time, vacations, workload, etc. may change response time for grievances.

- 22 -

I answered his grievances in a professional manner, guided by the facts in each case, and did not let other factors bias my responses.

After researching Perry's grievance, it appears that all of Perry's prior grievances were answered and none were neglected. Therefore, I find his complaint has no merit.

(Doc. 27-31, Grievance Response). Plaintiff received this grievance denial on October 25,  2018. (Doc. 27-32, receipt). Plaintiff never filed any appeal to this grievance denial. (See Doc. 27-8, Treatment Program Notes).

## IV. DISCUSSION

### A. Exhaustion

Under the PLRA, a prisoner must pursue all available avenues for relief through the prison's grievance system before bringing a federal civil rights action. See 42 U.S.C. §1997e(a); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). Section 1997(e) provides, in relevant part "[n]o action shall be brought with respect to prison conditions under section 1983 of the Revised Statutes of the United States, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. §1997(e). The exhaustion requirement is mandatory. Williams v.

Beard, 482 F.3d 637, 639 (3d Cir. 2007); Booth, 532 U.S. at 742 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"). Moreover, while Plaintiff was released from prison after filing the above-captioned case (Doc. No. 10), he is still bound by the exhaustion requirement because he has raised claims concerning events that occurred prior to his release. See Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002).

The United States Court of Appeals for the Third Circuit has further provided that there is no futility exception to §1997e's exhaustion requirement. Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000). Courts have typically required across-the-board administrative exhaustion by inmates who seek to pursue claims in federal court. Id. Additionally, courts have imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See e.g., Bolla v. Strickland,

304 F. App'x 22 (3d Cir. 2008); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000).

This broad rule favoring full exhaustion allows for a narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Warman, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted

"substantial compliance" with this statutory exhaustion requirement. Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him. Warman, 49 F. App'x at 368. Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003); see also Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing.' ") (citations omitted).

The Supreme Court has considered what renders administrative remedies unavailable to an inmate such that a failure to exhaust can be excused. See Ross v. Blake, 136 S. Ct. 1850 (2016). The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Id. at 1859. First, an administrative procedure is not available "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a procedure

is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation. Id. at 1860.

The Third Circuit recently joined other circuits to hold "that administrative remedies are not 'available' under the PLRA where a prison official inhibits an inmate from resorting to them through serious threats of retaliation and bodily harm." Rinaldi v. United States, 904 F.3d 257, 267 (3d Cir. 2018). To defeat a failure-to-exhaust defense based on such threats, "an inmate must show (1) that the threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance and (2) that the threat actually did deter this particular inmate." Id. at 269.

Finally, failure to exhaust is an affirmative defense that must be pled by the defendant. Jones v. Bock, 549 U.S. 199, 216 (2007). "In a motion for summary judgment, where the movants have the burden of proof at trial, 'they [have] the burden of supporting their motion for summary judgment with credible evidence... that would entitle [them] to a directed verdict if not controverted at trial'." Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006) (quoting In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (internal quotations omitted)). If "the motion does not establish the absence of a

genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." Id. (quoting Nat'l State Bank v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1582 (3d Cir. 1992) (internal quotations omitted)).

Here, Defendants argue that Plaintiff's grievance record demonstrates that he failed to properly exhaust his administrative remedies prior to filing the instant action. The record clearly demonstrates that Plaintiff either failed to initiate the grievance process or failed to fully complete the process regarding his many issues raised within his complaint.

In opposition, Plaintiff attempts, but fails, to demonstrate that he has exhausted three of the issues raised. (See Doc. 29, Brief in Opposition).

Initially, Plaintiff attempts to demonstrate that he exhausted his claims concerning being housed with Inmate Thompson. In particular, Plaintiff attempts to rely on a September 6, 2018 entry in his Treatment Program Notes which states the following:

> Inmate turned in a sealed homemade envelope asking me to forward it to as a grievance appeal. I did speak to inmate on P4 with CO Myers. I asked Inmate what step appeal it is, and he told me to open the envelope. I explained to inmate that he will need to open the envelope. When inmate opened the envelope, it was discovery that it was a 3rd Step grievance. I instructed Inmate to refer to his inmate handbook in which it states that he will need to mail the grievance appeal downtown. I returned the paperwork to inmate and inmate stated he will mail it.

Id. at 10. Plaintiff states that, in accordance with CO Myers' recommendation, he "mailed 3rd step appeal on 9-7-18." Id. While Plaintiff may have attempted to appeal his grievance relating to Inmate Thompson, it appears that such attempt came several months after the July 19, 2018 filing of his federal action and almost a month before the October 4, 2018 denial of his grievance appeal. (See 27-17, 27-18).

Likewise, Plaintiff's attempts to bolster his argument of exhaustion with respect to his claims regarding Inmate Williams and his claims concerning grievance response time, fail for the same reason. With respect to his claims regarding Defendant Williams, Plaintiff attempts to argue that he filed a third step grievance appeal yet provides no evidence of such. Regardless, even if Plaintiff filed a third step review, the grievance process contemplates four levels of review. Exhaustion is not complete until final review before the Solicitor of Dauphin County.

Plaintiff's same argument with respect to his claims concerning grievance response times fares no better. Plaintiff again claims that he filed this grievance to third step review. He fails, however, to submit any evidence of such, or to refute Defendants' exhibits which demonstrate that Plaintiff never filed a second step grievance appeal to the original grievance denial.

Finally, and most fatal to Plaintiff's opposition, is that all of Plaintiff's exhibits in opposition are dated well beyond the July 19, 2018 filing date of the instant action. Thus, the Court finds even if Plaintiff attempted to exhaust his grievance to final review, he did so after he had already filed the above captioned action in federal court. To that end, the PLRA mandates that prisoners exhaust all available administrative remedies prior to initiating a suit under §1983 for the deprivation of Constitutional rights. 42 U.S.C. §1997e(a); Woodford v. Ngo, 548 U.S. 81, 85 (2006) (finding that prisoners must pursue their claims through prison channels prior to commencing related litigation in federal courts). The record is clear that Plaintiff did not exhaust his administrative remedies prior to filing the instant action, and Defendants are therefore entitled to summary judgment.

## V. MOTION FOR RECONSIDERATION

On February 20, 2019, in accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), (holding that the District Court shall provide the parties notice that it will consider exhaustion in its role as fact finder under Small v. Camden Cty., 728 F.3d 265 (3d Cir. 2013)), this Court issued an Order, converting Defendants' motion to dismiss to a motion for summary judgment and allowing the parties an opportunity to supplement the record

with supporting evidence relevant to the exhaustion of administrative remedies. (Doc. 23).

On March 25, 2019, Defendants filed a motion for summary judgment on the issue of administrative exhaustion, along with a statement of material facts and brief in support. (Docs. 27, 28). On April 3, 2019, Plaintiff filed a brief in opposition to Defendants' motion for summary judgment, (Doc. 29) and on April 17, 2019, Defendants filed a reply brief. (Doc. 30).

Because this Court converted Defendants' motion to a motion for summary judgment, and then Defendants filed a separate motion for summary judgment, this Court dismissed their original motion to dismiss as moot. (See Doc. 35).

On October 19, 2019, Defendants filed a motion for reconsideration, seeking to reinstate their original motion to dismiss, which challenges the legal sufficiency of Plaintiff's claims. (See Doc. 37).

Based on the record before this Court, Defendants' have demonstrated that they are entitled to summary judgment for Plaintiff's failure to exhaust his administrative remedies prior to bringing the instant federal action. This procedural bar negates the need to address the substance of Plaintiff's claims. Consequently, Defendants' motion for reconsideration will be denied as moot.

## VI. CONCLUSION

For the reasons set forth above, the Court will grant Defendants' motion for summary judgment, based on Plaintiff's failure to exhaust administrative remedies prior to filing his federal action. Defendants' motion for reconsideration will be dismissed as moot. A separate Order shall issue.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: February 19, 2021**
18-1430-01